[Civ. No. 26827.   Second Dist., Div. Two.   Sept. 18, 1963.]

IRVING GOLDSTEIN, Plaintiff and Respondent, v. RUTH
GOLDSTEIN, an Incompetent Person, etc., Defendant
and Appellant.

Arthur D. Guy for Defendant and Appellant.

Glass, Allen & Roberts and Thomas P. Allen, Jr., for
Plaintiff and Respondent.

ASHBURN, J.—Defendant wife through her guardian *ad
litem* appeals from a judgment annulling her marriage to
plaintiff Irving Goldstein upon the ground that defendant
was married to another and the marriage had not been dis-
solved. Appellant's attorney says: ''The sole question pre-
sented by this appeal is whether or not the defendant, an
incompetent person, has been denied procedural and sub-
stantive due process by reason of her own incompetency.''

The parties were married at Yuma, Arizona, on November
4, 1950 and lived together as husband and wife until August
24, 1960; there are two children of the marriage, Jeffrey and
Linda, aged respectively 8 and 6 years at the time of trial.
Defendant's marriage to her former husband was not dis-
solved until August 30, 1951.

This suit was commenced in September 1960. Beginning as
early as 1957 defendant developed severe mental disturbances

described by one psychiatrist, Dr. Jerry S. Flint, as a "severe mental illness, that is the schizophrenic reaction of undifferentiated type." Dr. Michael J. Singer, psychiatrist appointed by the court, reported that he had seen Mrs. Goldstein on January 23, 1961 (10 days before the trial), and that her condition was as set forth in footnote 1.

The trial judge having considered the psychiatrists' reports and such affidavits as were presented upon a motion for continuance of the hearing, gave the matter his careful consideration and came to the conclusion that defendant could not then testify and probably could not do so for a long period of time, if ever. He said, in part: "This report indicates that she would not understand an oath; that she could not recall events or could not relate them anywhere near accurately; that she could not be a witness, and that actually

---

[1]"On the basis of the picture presented by Mrs. Goldstein at this examination, this examiner would state the following: It is not felt that Mrs. Goldstein is a competent witness to testify in her divorce action. This examiner did not feel that she could recall and relate with reasonable accuracy events occurring at the time of her marriage in November of 1950 and subsequently to date hereof. She was unable to recall to this examiner the exact dates of her marriage, and was extremely hazy about dates and events several years ago. This examiner also feels that because of her degree of illness, Mrs. Goldstein does not understand the nature and significance of an oath to tell the truth. This examiner also believes, because of the severity of her mental illness, her examination and cross-examination in Court could conceivably cause her to suffer further mental trauma.

"This examiner feels that Mrs. Goldstein is suffering from a major mental illness, namely a chronic schizophrenic reaction, paranoid type. She shows marked residual effects of a long standing schizophrenic reaction, as manifested by the symptoms described above. ... It should be emphasized that Mrs. Goldstein's mental state may vary from day to day, in that on certain days she might be more lucid and coherent than on other days. However, in general, this examiner would state that the patient's general condition is one of moderate deterioration, due to the schizophrenic process that she has. On the particular date that this examiner examined Mrs. Goldstein, she was quite deteriorated, and quite ill, as is indicated by the answers given this examiner by Mrs. Goldstein.

"Psychiatric Diagnosis: Schizophrenic reaction, paranoid type, chronic, moderately severe, in exacerbation."

44 C.J.S. § 2 p. 44: "*Schizophrenia*. A basic disorder of the mind characterized by disorders of feeling and thinking, and the consequent disturbance of the patient's relation to the outer world, and in which the thinking is so disordered that it is not conceivably possible for the normal mental faculties to return and be stable in a short time; a type of psychosis characterized by loss of contact with the environment and by disintegration of the personality. It is popularly referred to as 'split personality' and is said to be another name for 'dementia praecox.'"

swearing her and examining or cross-examining her might cause mental or nervous trauma which would be detrimental to her, and that is another point the Court was interested in. We certainly don't wish to injure this lady in any way because it seems as though it would be a considerable period of time and the defendant does have a guardian *ad litem*; and under the points and authorities filed by plaintiff's counsel, the Court is satisfied the matter may go forward. Now, I want this to be clearly understood, that if it appeared that the defendant would likely be able to testify and to understand the nature and significance of an oath, and to recall events and be able to relate events coherently, within a few months or something like that, the Court did intend to put this over to permit such testimony in order to give the defendant her day in court, but inasmuch as it appears that this would be a long time, and it is possible she may never be in that position, I don't believe that the plaintiff should be made to wait forever before proceeding with this action. . . . It looks to me like it might be anywhere from a year to ten years to never, as far as she being a witness is concerned, and that doesn't seem right to wait, and so I am — You have not actually made a motion today for it.'' (This was a reference to her attorney's desire for a continuance.)

█ Counsel for appellant complains of the court's refusal to continue the trial to enable him to make further preparation, but the circumstances of the motion and its denial were such that it cannot be said there was an abuse of discretion on the part of the court unless it can also be said that defendant's insanity precluded any hearing during its continuance. Counsel's attempted interviews with her had failed to elicit any facts whatever because of her confused and excited mental condition. He has stressed this latter point and claims a denial of due process.

To date the law seems to be against appellant and the case to be controlled by *Harrigan* v. *Harrigan*, 135 Cal. 397 [67 P. 506, 87 Am.St.Rep. 118]. That was a divorce action but its reasoning seems equally applicable to annulment. There, as here, the cause of action had arisen before the defendant became insane and the question was whether a fully accrued cause of action for marital wrong could be pursued during the incompetency of defendant rather than whether insanity could be interposed as a defense to a wrong accomplished prior to insanity.

The court in *Harrigan* placed its ruling upon the same

basis as any other civil action in that an insane person can be sued and served (Code Civ. Proc., § 411, subd. 4; § 373, subd. 3) and the cause of action reduced to judgment provided prescribed procedure is followed. The court said, at page 397: "This appeal presents the sole question as to whether or not a divorce can be granted against an insane defendant whose insanity did not exist at the time the the right to a divorce accrued. ... The plaintiff, therefore, on account of the willful derelictions of defendant, had the right, given her by the statute, before defendant became insane, to procure a dissolution of the bonds of matrimony. Was this right taken away or suspended by reason of defendant's subsequent insanity? In criminal cases, although defendant was sane when the crime was committed, if he becomes insane before or during the trial, the proceedings will be arrested and no judgment can be pronounced. This is upon the theory that an insane person is incompetent to make his defense. ... While this is the rule in all civilized countries in regard to prosecutions for crime, it has no application to civil cases. Insane persons are incapable of entering into contracts while suffering under this great calamity. The law throws around them its protecting shield for the reason that, having no mind, they cannot enter into a contract. But in cases of all contracts or liabilities incurred by parties while sane, the law affords a remedy, even though the party making such contract, or incurring such liability, has since become insane. This is recognized in the code, which provides for service of summons upon insane persons and for the appointment of a guardian *ad litem* after such service. We can see no reason why the same rule should not be applied to plaintiff in an action for a divorce where the cause of action accrued during the sanity of defendant. It is true that defendant may not be able, by reason of his insanity, to present some fact or defense known only to himself while sane. The same reason would apply in any proceeding against an insane defendant on any other contract or liability. If he executed a promissory note while sane, he may be sued upon it while insane. Yet it may be that if sane he could show payment or other valid defense to it. We cannot deny the right of parties to come into the courts to enforce remedies because of such imaginary or fanciful reasons." At page 399: "Therefore, the law, in its wisdom, will not deprive a party forever of the privilege of coming into court for redress, because the party against whom relief is sought has lost his reason. The views herein expressed are sustained by the better-reasoned authorities." The lower

court had ruled that the action could not be maintained against defendant "while he is insane" but a department decision of the Supreme Court held this to be error and reversed the judgment.

This case undoubtedly represents the weight of authority as it stands today. See, Note in 19 American Law Reports 2d 144, entitled, "Insanity as affecting right to divorce or separation on other grounds."

This case appeared upon our May 1963 calendar. At that time Mrs. Goldstein's attorney called our attention to the fact that she was in the courtroom and had been released from Camarillo some months before. The matter was submitted but, impressed with the thought that defendant probably would be able to defend the action at the present time, we vacated the submission and gave her counsel leave to produce additional evidence bearing on the question of appellant's present mental and physical capacity to counsel and advise her attorney, to testify in court and otherwise to defend the action. To that end we appointed the trial judge, Honorable Joe Raycraft, referee to take such testimony, make findings and report to this court. That report now is before us and no exceptions have been taken thereto.

Although Mrs. Goldstein's attorney testified before the referee "that he has seen appellant 8 or 9 times in the past year and this is the first time that he has seen her confused; that her memory is distorted today," the referee's findings are as follows: "Based upon the foregoing testimony and exhibits, as well as observations of the appellant in the courtroom and on the witness stand, the undersigned finds that the appellant shows marked confusion of her thought processes, marked memory impairment and inability to accurately recall or relate dates or past events. Her judgment seems also to be impaired. She obviously did not understand the significance of the oath. Her credibility as a witness, as of August 2, 1963, would be rated as zero. Neither could she be considered a competent witness due to her lack of ability 'to perceive, recollect and communicate with reference to the event in question.' [People v. James, 218 Cal.App.2d 166, at p. 173 [32 Cal.Rptr. 283].] The opinion of Dr. Nash, Exhibit 3, based upon a note in her file, that as of September 14, 1961, 'she was probably legally competent to appear as a witness and testify in court' is obviously not correct at this time, but the opinion of Dr. Singer, who re-examined appellant May 28, 1963, that she could not be a competent witness, is enti-

tled to great weight and is the finding of your Referee.

"Appellant's physical capacity to counsel with her attorney and to testify is apparently good, but she does not possess the present mental capacity to do so."[2]

We cannot say that the evidence does not sustain the referee's findings and so we must proceed upon the basis that Mrs. Goldstein is presently unable to defend or assist her attorney in defending the action.

Appellant's claim of denial of due process seems to be refuted by the *Harrigan* decision which we feel obligated to follow.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

---

[2]At the time set for oral argument on September 12, 1963, appellant's counsel made the following statements:

"MR. GUY: The matter has been previously argued and submitted and I am only here to answer questions and perhaps offer some small apology to the Court and one point that I want to state to the Court. . . . My point is, your Honor, that at the time that the affidavit was made of Mrs. Goldstein she appeared to me to be competent and that she certainly was confused and disarranged and very much confused at the time that we appeared in court. The only explanation that I can offer there is that I did perceive that in coming to court, we came up to this court on at least two or three different occasions, and I noticed a certain amount of anxiety building up each time. . . . I did find that as the time approached for her to give her testimony before the Referee that she became more and more disarranged and the date that we went into court she was very much confused, in my opinion, for what it's worth, and to that extent — JUSTICE FOX: You don't take any exception then to Judge Raycraft's report? MR. GUY: No, your Honor. I find that Judge Raycraft was very fair and that he certainly extended himself in giving us perhaps an hour or an hour and a half of cross-examination that she was on the stand, in the hearing."